1

2

3

4          UNITED STATES DISTRICT COURT

5          CENTRAL DISTRICT OF CALIFORNIA

6                SOUTHERN DIVISION

7                    – – –

8     THE HONORABLE JAMES V. SELNA,   JUDGE PRESIDING

9
      UNITED STATES OF AMERICA,
10                   Plaintiff,

11                                       SACR-05-36-JVS

12        ALLEN E. JOHNSON,
                     Defendant.
13    ------------------------------

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               Santa Ana, California

18                June 2, 2008

19

20

21

22          SHARON A. SEFFENS, RPR
            United States Courthouse.
23          411 West 4th Street, Rm 1-053.
            Santa Ana, California  90012
24          *(714) 543-0870*

25

1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3    DEBRA W. YANG
     Assistant United States Attorney
4    WAYNE GROSS
     Assistant United States Attorney
5    Chief, Southern Division
     ANDREW STOLPER
6    Assistant United States Attorney
     411 West Fourth Street, 8th Floor
7    Santa Ana, CA  92701
     (714) 338-3536
8

9    For the Defendant:

10   JAMES D. RIDDET
     STOKKE & RIDDET
11   3 MacArthur Place, Suite 750
     Santa Ana, CA  92707
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SANTA ANA, CALIFORNIA; MONDAY, JUNE 2, 2008; P.M. SESSION
 2            THE CLERK:  Item 16, SACR-05-36-JVS, United States
 3   of America versus Allen Johnson.
 4            Counsel, please state your appearances.
 5            MR. STOLPER:  Good afternoon, Your Honor.  Andrew
 6   Stolper on behalf of the Government.
 7            THE COURT:  Good afternoon.
 8            MR. RIDDET:  And James Riddet for Mr. Johnson, who
 9   is present at counsel table.
10            THE COURT:  Good afternoon.
11            Have you all had a chance to review the draft
12   sentencing memorandum?
13            MR. STOLPER:  Yes, Your Honor.
14            MR. RIDDET:  Yes, Your Honor.
15            THE COURT:  Mr. Stolper, do you have any
16   additional comments?
17            MR. STOLPER:  Your Honor, I'd like to, if I may,
18   explain how we arrived at the four-level departure and
19   hopefully solve some of the -- I know that the Court said it
20   was perplexed by the disparity, and I want to just lay out
21   what happened so that the Court understands how the
22   Government arrived at where we arrived.
23            The reason the Government referred to Mr. Ketner's
24   PSR sentence was that's what the Government anticipated at
25   the time that we arrived at our plea agreement with Mr.
```

1   Johnson.  Subsequently, we pled Mr. Ketner out to a sentence

2   that was below that, and as a result of that disparity, the

3   Government now feels that Mr. Johnson is entitled to come in

4   underneath Mr. Ketner.

5            It's not that the Government is saying that Mr.

6   Ketner's sentence was incorrect in any way, shape, or form,

7   but simply at the time when we struck the agreement with Mr.

8   Johnson, we didn't have an agreement with Mr. Ketner.  As a

9   result, they ended up being not consistent at the end of the

10  day.  It's through this departure that the Government is

11  attempting to make them consistent.

12           Does that respond to the Court's concern?

13           THE COURT:  I think so.

14           MR. STOLPER:  Okay.  Beyond that, the Government

15  would submit on its paper.

16           THE COURT:  The Government recommended a lower

17  sentence.

18           MR. STOLPER:  That's correct, Your Honor.  The

19  Government still recommends a 12-month -- a year-and-a-day

20  sentence.  The Government believes that that's at the low

21  end of the guideline range.  The Government has agreed to

22  recommend a low-end sentence as part of its plea agreement,

23  and we stand by that agreement.

24           THE COURT:  Okay, thank you.

25           Mr. Riddet.

1          MR. RIDDET:  Thank you, Your Honor.  Your Honor,

2     with the Court's permission, I just have a few general

3     comments that I'd like to --

4          THE COURT:  Let me just share with you one concern

5     I have at the outset.  There seems to be a disconnect

6     between the conduct described in your several sentencing

7     positions and the conduct described in the plea agreement.

8          MR. RIDDET:  In what way?

9          THE COURT:  In that I wouldn't recognize the

10    conduct -- if I were looking for the conduct in the plea

11    agreement, I really wouldn't find it.

12         MR. RIDDET:  If you look at this factual basis in

13    the plea agreement, it seems to me, Your Honor, the factual

14    basis is exactly the same as what I have argued in my

15    sentencing brief, and that is that the honest services fraud

16    took place at the time that Mr. Johnson recognized that

17    there was a problem in that he heard that checks had been

18    bouncing, and it was after that time that he continued to

19    allow Mr. Ketner to have the funds at the MCR end.

20         We did not -- and there were, I am sure Mr.

21    Stolper will agree, quite a few discussions about what the

22    factual basis would say.  We did not agree to a factual

23    basis which said that there was an honest services violation

24    from the time that Mr. Johnson agreed to the proposal by Mr.

25    Ketner to send the funds there.  We agreed to a factual

1   basis that said the honest services violation took place

2   once Mr. Johnson realized there was a problem and then

3   adhered to and acceded to Mr. Ketner's explanation that I

4   work it out with the banks.  At that point, he admitted in

5   the plea agreement that he violated his honest services

6   obligation to the lenders.  I think there is a difference.

7          THE COURT:  Well, the position you take with

8   regard to the money laundering is certainly different.

9          MR. RIDDET:  True, Your Honor.  At the time, we

10  entered into the money-laundering agreement -- I think it's

11  important for the Court to understand that the money that is

12  being laundered is not the money that Ketner stole from

13  these loan funds.

14         THE COURT:  I understand.

15         MR. RIDDET:  It is the commissions that he was

16  getting from the warehouse lenders, and we did agree to a

17  larger sum.  Then we had to do an analysis and we realized

18  that although we certainly are going to stick with the plea

19  agreement, that it may well be that using that number

20  overstates his culpability in that it looked to us then,

21  after we had this woman do the audit, that the vast majority

22  if not all of the sharing of the commissions with Mr. Ketner

23  took place actually before Mr. Johnson learned that there

24  was a problem.

25              We've kind of used March as the date.  In Ketner's

1   statement to my investigator, he thinks it could be April or

2   May, so it's within that time frame, somewhere between March

3   and May.

4           Your Honor, there are, as I see it -- when Your

5   Honor focuses on the issue of loss in this case, there are,

6   as I see it, three players involved.  The man who took the

7   money for his own purposes is Mr. Ketner.  He is the one

8   that instructed Mr. Hadari to send the money to a

9   non-funding account rather than to do what everyone agrees

10  Mr. Johnson told him to do, and that is to send the money to

11  one of Ketner's funding accounts.

12          That's what Hadari told my client's accountant

13  that's what he was instructed to do, and he had no

14  explanation as to why he didn't do it.  Ketner is the one

15  who used a substantial portion of these funds for his own

16  use, either buying a yacht or a car or funding other things.

17  A lot of the money went into his own operating account and

18  was used to pay payroll.

19          Not one dime of those funds which Mr. Ketner stole

20  ended up in Mr. Johnson's pocket, not pocket one dime of

21  that money.  The only compensation that he did receive was

22  the closing fees that were paid to him by the warehouse

23  lender.  As to that, Mr. Ketner required him to split those

24  fees with him, so he got half of his normal commission.

25          As Mr. Stolper has pointed out, Ketner received a

1    sentence of 57 months.  Now let's look at the second player.

2    The second player, it seems to me, is this gentleman by the

3    name of Hadari.  Hadari was an individual who was supposed

4    to be working for Mr. Johnson.  You have as an exhibit to

5    the first sentencing brief -- by the way, I understand Your

6    Honor has read our original sentencing brief and the two

7    supplements; right?

8              THE COURT:  Right.

9              MR. RIDDET:  Okay.  You have an exhibit where Mr.

10   Johnson's accountant talks with Mr. Hadari, and he admits

11   that he was told to send the money to the funding accounts

12   and didn't do it.  He didn't do what Mr. Johnson told him to

13   do.  Instead, he followed Mr. Ketner's instructions and sent

14   funds to Ketner's other accounts of which he had 20 or 25

15   different accounts.

16             Mr. Hadari has never been prosecuted.  Clearly,

17   Your Honor, when you look at the facts which I don't believe

18   are contested in this case, Mr. Hadari was in effect an

19   aider and abettor to Mr. Ketner's scheme to steal these

20   funds.

21             The third player is Mr. Johnson.  He entered into

22   a plea agreement in which he stated that he violated his

23   honest services obligation to the lenders by continuing to

24   send money to Ketner after he learned that there might be a

25   problem.  Rather than putting a stop to it right then, he

was persuaded by Mr. Ketner that Mr. Ketner would work out
whatever the problem was.  If there is any fault for Mr.
Johnson, it is agreeing to Mr. Ketner's request rather than
putting a stop to it and returning to the funding of loans
himself, which had been done prior to the time that Ketner
changed the arrangement.

If you are going to, Your Honor, apportion the
fault, and that is apportion the fault for the losses of
around $10 million, it seems to me that Your Honor could
easily find and should find that 95 percent of the fault
that caused the loss in this case is Ketner.  He stole the
money, and he misappropriated it for his own use.

Now, there are essentially -- by the way, as Your
Honor pointed out as Mr. Stolper has indicated and indicated
in his brief, we were contacted rather early before any
charges were filed.  Mr. Johnson came in, sat in on I think
more than one proffer session, agreed to cooperate, and Your
Honor has as an exhibit to Mr. Stolper's brief with rather
extensive notes of the proffer session that he gave, and
then rather than requiring a trial, he entered a plea of
guilty.

Now, there essentially are two issues, Your Honor,
as to the sentencing decision which you estimate you have to
make.  The first is whether or not Mr. Johnson should spend
any time in jail or whether he should instead receive a

1    sentence of house arrest or home detention as we recommend,

2    as we request.

3           The second is whether the Court should apportion

4    the restitution -- and I will get to Your Honor's apportion

5    of the restitution in a moment.  That is a second issue, and

6    of course part of the restitution issue is if you order

7    restitution to be paid in a certain amount how it is to be

8    paid.

9           Let me talk about the first issue.  I am not going

10   to go into great detail because these have been argued in

11   great detail in writing.  So let's talk about the home

12   detention issue versus jail.  We have argued that

13   extensively in our brief, and we've attached a number of

14   exhibits which I know Your Honor has read.

15          Here are the factors which I think indicate that

16   this should be a sentence of home detention rather than

17   jail.  Mr. Johnson is a 61-year-old man with no prior

18   record.  He has, as we pointed out -- and attached is a

19   letter from his doctor -- some rather significant arthritis

20   problems.  He lost his insurance when he and his wife split

21   up, and he had to then go on this Cobra coverage which Your

22   Honor knows is only good for a year.

23          He tried to stop taking the medication, which

24   helped, because he felt that if he was taking the medication

25   at the time that Cobra expired in September of this year,

1    just a couple months away, that he would not be insurable.

2    So he tried to stop taking the medication, and he couldn't

3    stand it.  It was too painful to him.

4              So he went back to taking the medication, and his

5    doctor points out that that does help alleviate his

6    condition to some extent, although he is still not able to

7    perform like a normal, healthy person.

8              In all probability, Your Honor, I think it's fair

9    to conclude that when his coverage expires under Cobra, he

10   is not going to be insurable, and he is going to end up

11   paying out of his own pocket about $15,000 a year for this

12   very expensive insurance.

13             Next, as I pointed out just a minute ago, Mr.

14   Johnson has not received any of the funds that Ketner

15   misappropriated.  Next, other than funding him the loans

16   himself, which is obviously what he should have done once he

17   learned there was a problem, it seems to me, Your Honor,

18   that you could find that absent that, he did everything that

19   he could to make sure that the loans were funded because

20   what he did is he very carefully instructed his employee,

21   Hadari, to send the money directly to a funding account.

22             Now, because of that, because of his very limited

23   role in the actual loss in this case, I have argued and I

24   argue today that applying that loss figure to calculate the

25   guideline range overstates the degree of his culpability;

1   and in addition to that, it is a basis, a substantial basis,

2   for role reduction.

3          Next, in his background he served two combat tours

4   in Vietnam and has been decorated to some extent for that

5   service.  He has lost permanently his license to practice

6   law.  Most if not all of the loss occurred according to our

7   audits before he learned there was a problem.  So these

8   losses were during the time that he assumed that Mr. Hadari

9   was complying with his instruction to send the money to a

10   funding account.

11          Lastly, as Your Honor points out in your

12   tentative, he is caring for his elderly and ailing parents.

13   In fact, because he needs to be with them, he had moved in

14   with them a few months ago and is helping them get around

15   and taking them to doctors.

16          I think, Your Honor, that all of those factors are

17   a significant basis for the Court to vary the sentence below

18   the guideline level and to impose a sentence of house arrest

19   or home detention.

20          Now let me turn to the issue of restitution.  We

21   addressed two issues:  first of all, the amount; and

22   secondly, how that is to be paid.  We've cited to Your Honor

23   Section 3664(h) of Title 18, which gives the Court the power

24   to apportion the restitution.  That section indicates two

25   factors that are to be considered -- the level of

1    contribution to the loss and economic circumstances.

2          We have provided the Court, I think, with abundant

3    evidence showing clearly that his level of participation or

4    contribution to loss is extremely minor, and we have

5    provided, I think, substantial evidence that his assets

6    consist of one asset, and that is his retirement account,

7    which he estimates now is about $800,000.

8          Now, the Government argues and Your Honor states

9    in your tentative that had it not been for Mr. Johnson's

10   agreement to continue to send the money to Ketner or his

11   company, MCR, for funding, that Ketner would not have been

12   able to steal the money as he did.  There is no question

13   that that is true, but I think it ignores what Mr. Johnson

14   did try to do, and that was his mistake.  That's why he's

15   here, because he did that.

16         He did not say to Mr. Hadari, "Do whatever Ketner

17   wants.  If he wants it sent to a nonfunding account, do

18   that.  If he wants to buy a car with it or if he wants to

19   buy a yacht with it, do that."  He said to Mr. Hadari, "Send

20   that money to a funding account because I want these loans

21   funded."  He did not know what Ketner was going to do, and I

22   don't think, Your Honor, there is one iota of evidence to

23   the contrary, one piece of evidence that would show that Mr.

24   Johnson at any time up until the time he learned the checks

25   were bouncing had any idea that Ketner had it in his mind to

1   take this money for himself and not fund these loans.

2           Where one person, Your Honor, steals the money and

3   makes use of all the proceeds himself and one person simply

4   does one act which allows that person to do what he does, it

5   seems to me there is an enormous difference in the

6   contribution of those two people to the loss itself.

7           Ketner himself recognizes that in two statements

8   -- one to my investigator and one to another individual who

9   used to work for the Orange County District Attorney's

10  Office -- recognizes that Al Johnson had no idea what Ketner

11  was going to do.

12          As to the amount to be ordered, we did indicate at

13  one time early in the brief that there was somewhere in the

14  neighborhood of $2 million that may have been funded -- or,

15  I mean, not funded but sent to Ketner or to one of his

16  nonfunding accounts after March and after Mr. Johnson

17  learned that there was a problem.  Now we have done this

18  additional analysis, and it appears that it may well be much

19  less than that.

20          So the amount of restitution to order is a

21  difficult concept.  At one point we argued that it appeared

22  that, since we thought there were $200 million in loans and

23  the Government was claiming a loss of $10 million or as much

24  as $14 million, that that's a very small percentage.  If we

25  use $2 million, we take five percent of that, and that

1    should be the amount of restitution that he should pay.

2           There is evidence which would support an order

3    that Mr. Johnson pay no restitution if Your Honor accepts

4    our argument that the restitution should be determined by

5    his culpability once he learned that the funding was not

6    being done.

7           THE COURT:  Is his culpability zero percent?

8           MR. RIDDET:  His culpability is not zero percent.

9    I cannot stand before your Your Honor, nor will Mr. Johnson,

10   and say his culpability is zero percent.  What I can say,

11   Your Honor, is that the culpability -- and I think the

12   statute says the degree of contribution to the loss -- is

13   minimal.  I mean, if you put it in percentages, I think

14   honestly you could say five, six, seven percent compared to

15   95 percent or more from Ketner as to what caused this loss.

16   The guy who caused this loss mainly is Mr. Ketner.

17          Then, of course, the economic circumstances is the

18   second factor which that section in Title 18 points out.  As

19   to that second factor, it's pretty clear that but for his

20   requirement, which he lives off of, he's broke.  He has

21   expenses each month of over $4,000, and he gets $700 or $800

22   by way of income.  So he doesn't have anywhere near enough

23   to live on.  So that factor also, I think, mitigates

24   strongly in favor of a small amount of restitution.

25          Then if the Court does order restitution, the next

1   question is how it should be paid.  Your Honor seems to

2   acknowledge the letter from his accountant --

3                THE COURT:  I think it's part wrong, though.

4                MR. RIDDET:  You do say in a footnote that you

5   think -- his benefits don't trigger until 65, so I --

6                THE COURT:  Well, is this a peculiarity of the

7   plan, or is this just the function of usual tax laws from

8   withdrawing from an IRA?

9                MR. RIDDET:  May he answer that, because he knows

10  more about the extent of that?

11               THE COURT:  Sure.

12               THE DEFENDANT:  The plan calls for retirement age

13  at 65 and penalties prior to that time.

14               THE COURT:  Are in the plan itself?

15               THE DEFENDANT:  Yes, Your Honor.

16               THE COURT:  Okay.

17               MR. RIDDET:  Now, Your Honor, the Booker Court

18  made clear that the provisions of Title 18, Section

19  3553(a)(2), is mandatory.  That is the one thing that is

20  binding on the Court now.  The Guidelines are no longer, as

21  Your Honor points out in your tentative decision.

22               Section 3553 states that the Court shall impose a

23  sentence sufficient but not greater than necessary to comply

24  with the purposes set forth in Subsections (a) through (d).

25  I respectfully submit, Your Honor, that a sentence of jail

1    under the very unique circumstances of this case is greater

2    than necessary to accomplish those goals and that such a

3    sentence would violate the statutory mandate of section

4    3553; whereas, a sentence of home detention would be

5    sufficient to accomplish those goals.

6            As to restitution, I will submit that on the

7    papers.  Mr. Ketner, as I understand it -- I assume was

8    sentenced by Your Honor -- has been ordered, I am sure, to

9    pay a full amount of restitution.  It seems appropriate

10   since he is the one who stole the money.  So the question

11   is:  What do we do with Mr. Johnson on the question of

12   restitution?

13           I do just have, if Your Honor will bear with me,

14   just a couple of comments with regard to your tentative

15   decision.  You state at the top of page 3 of your tentative

16   decision that there is little doubt that as a literally

17   pivotal player in the scheme, his assistance was of great

18   value in unraveling this complex fraud.  There is no

19   question that he was a pivotal player in providing

20   cooperation to the Government, because without his

21   cooperation they may not have had anywhere near the

22   information they did have.

23           But then later on that same page you state:

24   "However, he was certainly aware that he was taking the

25   unusual step of not funding the loans directly."  I don't

1  know that it's all that clear from the evidence that we have

2  that he was aware that this was unusual.  Here is a man, Mr.

3  Ketner, that he had known for years and had known was in the

4  mortgage business for years and had offices all over the

5  country, and Mr. Ketner makes this request to fund the loans

6  at his end stating that he has got some new software.

7          Now, Mr. Johnson's prior partner, who was a much

8  more experienced closing agent than Al Johnson, had no

9  problem with this arrangement, and he agreed to it also.  We

10  have attached as one of the exhibits a copy of the faxes

11  that he sent to one of the other banks that was a victim in

12  this case showing that he's also doing what Mr. Ketner

13  requested.

14          So I don't think, Your Honor, with all due respect

15  to what you said in the tentative, that Mr. Johnson is

16  necessarily aware that he was taking an unusual step, in

17  light of the fact that he's dealing with someone who is

18  experienced in the business, and he sees his partner who is

19  also experienced in the business readily agreeing to

20  Ketner's request.

21          On page 4, Your Honor says that the Court puts

22  little stock in the argument that all of Johnson's closing

23  activities were usual and customary up to the transfer of

24  funds.  I am not sure why Your Honor has said that.  I am

25  aware of no evidence which would indicate that other than

1    the funding itself -- and I will get to Your Honor's comment
2    that that's the pivotal part of the process -- that other
3    than that, he did not do the other duties that a closing
4    agent usually does.  I think there is no evidence to the
5    contrary, and Mr. Johnson takes the position that he did.
6           Then Your Honor says that the actual cutting of
7    the check or the funding is a critical step.  No question
8    about it.  It is the critical step.  But this is a case in
9    which Mr. Johnson tried as hard as he could try other than
10   not adhering to Mr. Ketner's request to make sure that the
11   loans were funded, and the way he did that was to instruct
12   his employee, who was supposed to follow his direction, to
13   fund the loans into a funding account and not a nonfunding
14   account.
15          The amount of assets that Mr. Johnson has is
16   $800,000.  Your Honor refers to that as significant.  It
17   would be significant to many people.  But when you consider
18   that he has no income and for the rest of his life -- he is
19   61 now -- that is all he is going to be able to live on.  I
20   mean, his own doctor says he probably can't carry on usual
21   employment activity.  He's in a great deal of pain and has
22   limited mobility in his arms and hands.  He has to live off
23   that.  So he has to pay these extensive medication costs
24   plus his normal living expenses, and there's no other place
25   to do it.  So although he has a nice retirement account, he

1    really does need to live off of it.

2          Your Honor on page 5 talks about the old rule that

3    when you were in zones, it depended on whether you could get

4    house arrest or whether it had to be half and half and all

5    that, and Your Honor points out that that is merely

6    advisory.  I know that in many cases the Government argues,

7    well, it may be advisory, but that's the Government's

8    policy, that if you're in a certain zone, you can't get home

9    detention.

10          I assume Your Honor recognizes that despite the

11   fact that a sentence may be in Zone A, B, C, or D, the Court

12   could give home detention for any amount because that 5C1.1

13   is no longer mandatory.  I don't think that Mr. Stolper's

14   recommendation of a year and a day falls, as you put it,

15   woefully short of the need to reflect the magnitude of the

16   fraud, even taking into account his substantial cooperation.

17   I think it's excessive in terms of the sentence that is

18   appropriate in this case when you consider the very, very

19   limited role that he had.

20          I imagine other than that, Your Honor, I would

21   submit unless Your Honor has any questions.  I believe that

22   this is probably the most unique bank fraud case that I have

23   ever had.  Most of the cases that Your Honor has before you

24   and most of the cases which I have handled involve

25   individuals who have been directly involved in the fraud

1    either because they have submitted false loan packages and

2    they have got something out of it.  This is a very unique

3    circumstance, and it is one in which Mr. Johnson exercised

4    bad judgment, yes; intended to have the banks lose money,

5    no.

6            Because of that, I ask Your Honor with all due

7    respect to reconsider your intention to give him 15 months

8    and seriously consider a sentence of home detention or at

9    least some home detention rather than all jail.

10           Unless Your Honor has any questions, I will

11   submit.

12           THE COURT:  No, thank you.

13           Mr. Stolper.

14           MR. STOLPER:  Thank you, Your Honor.

15           Your Honor, it's always a difficult position for

16   the Government to on the one hand argue for substantial

17   assistance, and then on the other hand to argue for in this

18   case jail.  In this case, it's not as hard because it's the

19   very substantial assistance the defendant was able to give,

20   his knowledge that he was able to provide to the Government

21   about what went on at MCR that was so valuable to us.  So

22   it's two sides of the same coin I guess.

23           On the one hand, Mr. Johnson should be commended,

24   and the Government has done what it does to commend people

25   who come in and cooperate with the Government for providing

1  the information he did with a generous 5K, but the flip side

2  of that coin is the reason the defendant was able to come in

3  and give that information is because he was incredibly

4  involved in what was going on at MCR.  I think respectfully

5  you can't have it both ways.  His substantial assistance

6  reflects the fact that he had extensive knowledge about the

7  illegal activity at MCR.

8         I want to make a couple comments about what Mr.

9  Riddet had to say, especially going to the question of

10  whether this is a unique case or not, and I agree that in

11  many ways it is a unique case because seldom do we have an

12  escrow agent or an attorney who is not fulfilling their

13  obligations.

14         Here Mr. Johnson was in the classic sense of the

15  word a gatekeeper.  It was his job to watch the bank's money

16  and to make sure it went where it was supposed to.  By

17  advocating that role, Mr. Johnson did precisely what the

18  bank told him not to do, which was hand the keys over to Mr.

19  Ketner, and Mr. Ketner quite predictably took those keys and

20  ran with it.

21         The failing here of Mr. Johnson is not listening

22  to what Mr. Ketner had to say.  That was a failing.  The

23  failing of Mr. Johnson was not adhering to the obligations

24  he accepted by becoming the bank's closing agent, to close

25  the loans with the money as he was instructed to do so.

1    Part of what is especially troubling about this

2    fraud is not just -- one of the things Mr. Riddet points out

3    that Mr. Johnson didn't get the bank's money that was

4    requisite to the borrowers.  That's true.  Instead, Mr.

5    Johnson took the bank's money as the closing agent and

6    essentially abdicated his role.  Some of the best evidence

7    of that abdication is not just the fraud that took place at

8    MCR after the defendant abdicated his obligation as the

9    gatekeeper, but to look at what Mr. Johnson and Mr. Ketner

10   did with that money.

11   That was not money that they simply put in their

12   accounts.  That was money that they literally laundered

13   around the world back to Nevada under false -- with false

14   names and false IDs.  It's like a spy novel in terms of what

15   they did with that money.  That from that Government's

16   perspective is a powerful knowledge point that what the

17   defendant knew early he was doing was absolutely wrong and

18   absolutely fraudulent.

19   The final comment I want to make goes to the

20   question of Mr. Hadari.  As I understand Mr. Riddet's

21   argument is that Mr. Hadari didn't follow the defendant's

22   instructions and sent money to the wrong account of Ketner.

23   I want to be clear on what the argument is and what it's

24   not.  As I understand Mr. Johnson's instructions as he

25   maintains today, Mr. Hadari was supposed to get the money

1    in; and instead of closing loans as he was obligated to do,

2    he then wire the money to Mr. Ketner's account.

3          Now, according to Mr. Johnson it was the wrong

4    account.  Instead of going to the funding account it went to

5    the operating account.  From the Government's perspective

6    that's completely beside the point.  The money shouldn't

7    have been sent to MCR directly at all.  It doesn't matter

8    which account it went to.  It was the defendant's obligation

9    to close those loans.

10          The banks weren't looking at Mr. Hadari, and they

11    weren't looking at Mr. Ketner to close the loans.  They were

12    looking to Mr. Johnson.  It's in that failure that Mr.

13    Johnson finds himself here looking at potential jail time.

14    It's the Government's position that after balancing both

15    sides of this equation, Mr. Johnson's tremendous involvement

16    and tremendous knowledge and his abdication of his

17    responsibilities at MCR has to be looked at through the

18    prism of the fact that he came in and from the Government's

19    perspective did right by helping the Government to go after

20    the person who did personally benefit from it.

21          While the Government tremendously appreciates what

22    the defendant did, the Government still believes that what

23    the defendant did was wrong and needs to be reflected in the

24    Government's recommended sentence of a year and a day in

25    jail.  There is an important difference in terms of

1     punishment between home confinement and prison, and the

2     Government believes that Mr. Johnson's abdication here

3     warrants a prison sentence, not a substantial prison

4     sentence but a prison sentence.

5               As to the question of restitution, the Government

6     respectfully disagrees with the defendant's position.  When

7     the defendant wired that money to MCR after he knows that

8     Mr. Ketner is bouncing checks, after he knows Mr. Ketner is

9     using the money for his own purposes, for him to claim now

10    that he had no idea that that money wasn't being properly

11    used, that there was no evidence to support that, is just

12    not supported by the evidence.

13              The evidence is quite clear by his own factual

14    basis that he was well aware that after February or March of

15    2000 that he knew Mr. Ketner wasn't using the money properly

16    and yet he kept shipping it to him.  From the Government's

17    perspective, it doesn't matter which account of Mr. Ketner's

18    he was shipping it to.  He was shipping it to Mr. Ketner,

19    and he should not have been doing that.  As a result, for

20    the defendant to now claim that he is not co-extensively

21    responsible for the restitution simply is not supported by

22    the facts.

23              Unless the Court has other questions, the

24    Government would submit.

25              THE COURT:  It seems to me one factor that I may

1    not have weighed sufficiently is the fact that when you

2    compare Mr. Ketner who was living the high life and spending

3    people's money, Mr. Johnson got nothing more than his

4    ordinary fee, and he only got half of that.

5            MR. STOLPER:  Factually, Your Honor, I think

6    that's absolutely true, that Mr. Johnson was proportionately

7    much less of a beneficiary of the fraud than Mr. Ketner.

8    The Government believes that that's properly considered in a

9    year-and-a-day sentence, because while Mr. Ketner is living

10   the high life, it was Mr. Johnson who was making that

11   possible.

12           As I said, the banks weren't looking to Mr.

13   Ketner.  They were looking to Mr. Johnson to make sure that

14   Mr. Ketner couldn't get his hands on the money.  For Mr.

15   Johnson to now somehow claim that he is not responsible for

16   Mr. Ketner basically stealing the money and living the high

17   life I think is belied by the fact that the banks looked to

18   him to be the closing agent.

19           So, Your Honor, while the Government actually

20   thinks the Court's reading of the facts is correct, that Mr.

21   Ketner was stealing the money and personally benefiting from

22   it, to the extent Mr. Johnson was not, we can't help but

23   point out that Mr. Johnson is the one that made that

24   possible.

25           THE COURT:  He sure didn't get much out of it.

```
 1              MR. STOLPER:  No, Your Honor, he did not.  He got
 2    a split closing fee.  But as the Court well knows, that's
 3    not the metric that we the Government uses.  It's not a
 4    question of just personal benefit.  It's a question of what
 5    harm he caused to victims.
 6              THE COURT:  I appreciate it, but it's certainly a
 7    distinguishing factor when you look at Mr. Ketner's
 8    situation.
 9              MR. STOLPER:  I agree, Your Honor.  I think that
10    there is no question Mr. Ketner was the prime beneficiary of
11    the fraud.
12              THE COURT:  Where did the money come from from the
13    transfers that are discussed as being laundered overseas in
14    the plea agreement?
15              MR. STOLPER:  Those are from closing fees, Your
16    Honor.
17              THE COURT:  Okay, thank you.
18              Anything further, Mr. Riddet?
19              MR. RIDDET:  Just very briefly, Your Honor.  Mr.
20    Stolper argues that the banks told Mr. Johnson not to do
21    what he did and told him to fund the loans himself.  There
22    is no evidence of that.  In fact, if Your Honor looks at the
23    supplemental brief that we filed, the first supplemental
24    brief, Exhibit C is a number of faxes which Mr. Johnson's
25    prior partner -- I will wait a minute until Your Honor finds
```

1     that.

2             THE COURT:  Got it.

3             MR. RIDDET:  All right -- which Mr. Johnson's

4     prior partner, James Dooley, is sending off to one of the

5     warehouse lenders, LaSalle National Bank -- I'm sorry.  It's

6     Regions Bank.  You will see at the top of the first page it

7     says to Customer Service, Regions Bank in Georgia.

8             So this lender -- and we don't have any reason to

9     believe that it's any different with the other lenders -- is

10    being told that the money is going to MCR.  That's what this

11    fax says.  The money is going to LaSalle National Bank in

12    Chicago, Illinois, account name, Mortgage Capital Resources.

13    That's Ketner's company, which we sometimes shorthandedly

14    refer to as MCR.

15            So there is no evidence that any bank said to Mr.

16    Johnson, nor has Mr. Stolper presented any, which said the

17    banks told him not to have someone else fund the loan.  With

18    regard to Mr. Stolper's argument that it doesn't matter

19    where the money goes, doesn't matter whether it was a

20    funding or nonfunding account.  Well, of course it does.

21            If Mr. Johnson says to Mr. Hadari, "Send it

22    wherever you want," that is far different than saying to Mr.

23    Hadari, "Send it to a funding account."  Why is it

24    different?  Because if he says the former, it's an

25    acknowledgment that the money may not be used to fund;

1    whereas, if he says the latter, it's certainly an indication

2    of his intent that he do it.

3            One of the factors in 3664(h) that the Court takes

4    into consideration is economic circumstances.  The first is

5    the degree of contribution to the loss, and the second is

6    the economic circumstances.  I don't think there is any

7    argument that Mr. Johnson got very little out of this, half

8    of his closing fees, and is not leading nor has he ever led

9    the high life.  He's living with his parents right now and

10   helping him them in their various illnesses.

11           If Your Honor orders restitution in the amount of

12   $2.1 million or $2.2 million, and the U.S. Attorney's Office

13   goes after that $800,000 retirement account, which is the

14   only asset that Mr. Johnson has, he is going to be on the

15   street.  I think that is an economic circumstance which Your

16   Honor should consider in deciding how much restitution to

17   give him.

18           There are a number of alternatives here, Your

19   Honor.  We have taken the strong position that this is a

20   home detention case, and the Government is taking the strong

21   position that it's a jail case, a year and a day.  Your

22   Honor knows you have the power to make it a little of each.

23           If Your Honor feels that some jail is required, we

24   would obviously not be thrilled with that, but it would

25   certainly be better if you split it and allowed him to do

1    some of the time in home detention.  During the home

2    detention, he would obviously be at his parents' house

3    taking care of his mom and dad, and that would seem to me a

4    far better place than for him to be in jail.

5         Lastly, Your Honor is quite correct that Mr.

6    Ketner lived the high life.  He used some of that money for

7    his own personal assets -- bought a car and funded his

8    payroll and things like that.  He was doing well.  He was

9    doing well until Mr. Johnson came forward and gave the

10   Government evidence to charge him with what he did wrong.

11        Thank you, Your Honor.  Unless the Court has any

12   questions, I will submit.

13        THE COURT:  One question for Mr. Stolper, where is

14   Mr. Hadari?

15        MR. STOLPER:  Your Honor, the Government

16   interviewed Mr. Hadari, and we simply disagree with the

17   assessment of Mr. Riddet as to Mr. Hadari's relative

18   culpability.  There is probably little more I can say about

19   that other than simply we didn't consider Mr. Hadari to be

20   frankly high enough in the pecking order of MCR to be worthy

21   of bringing charges against.  There are a number of other

22   people at MCR who also had very senior positions, and as is

23   customary in our office, we like to go after the principal

24   leaders of any fraudulent conspiracy, and Mr. Hadari just

25   didn't qualify.

```
1              THE COURT:  That's what prosecutorial discussion
2   is all about.
3              Mr. Johnson, have you read the several versions of
4   the presentence report?
5              THE DEFENDANT:  Yes, Your Honor, I have.
6              THE COURT:  Have you had a chance to discuss those
7   with Mr. Riddet?
8              THE DEFENDANT:  Yes, I have.
9              THE COURT:  And have you had a chance to review
10  the draft sentencing memorandum that was handed out today?
11             THE DEFENDANT:  Yes, I have.
12             THE COURT:  Have you had a chance to discuss that
13  also with Mr. Riddet?
14             THE DEFENDANT:  Yes.
15             THE COURT:  Is there anything you would like to
16  say before I impose sentence?
17             THE DEFENDANT:  I would like to apologize for
18  trusting an individual that I clearly shouldn't have
19  trusted.  I would like to say that I really didn't know what
20  was going on.  I had no facts to make my judgment on and
21  finally I found myself in the middle of this nightmare.
22             I made what I thought was a practical decision in
23  putting Ketner in front of his lenders and putting some
24  sunlight on what was going on and have him try and work this
25  thing out.  I had no idea what was going on at the time.  It
```

1    was a practical decision.  I know it was a wrong one now,

2    and I apologize for that.  But I never had any intent to

3    steal money, and I never had any intent for him to steal

4    money.  I had every intent to do my job properly.

5          When I agreed to send the money, it was through

6    negligence, I would say.  It certainly wasn't by virtue of

7    an intent to do something wrong and not do my duty as a

8    closing agent.  I had a partner who was an experienced

9    closing agent who I relied on who didn't see anything wrong

10   with it, and I apologize for the laws that got broke.

11   That's all I can say.

12          THE COURT:  Thank you.

13          One of the advantages for me in preparing a

14   written tentative is that it makes clear the factors I have

15   focused on in coming to a tentative decision.  It also

16   affords the parties an opportunity to bring to my attention

17   factors that I either overlooked or didn't give appropriate

18   weight to.

19          I think one such factor is the fact that Mr.

20   Johnson did not benefit personally from this scheme.  He

21   admits his culpability and his mistakes, and it's clear he

22   was a contributor to the bank's loss in this, but I think

23   it's significant that he didn't gain particularly when I

24   contrast that with Mr. Ketner's situation where he

25   unquestionably personally gained and enjoyed the finest

1    things in life that this community can offer one.

2           Having looked at that factor, I still believe that

3    this is a jail case.  The extent of the fraud here is just

4    too large to think that jail is not required in terms of

5    recognition of the seriousness of the crime and in terms of

6    deterrence, but I think that the Government's recommended

7    sentence of a year and a day is sufficient on the facts of

8    this case.  I take into account all the conversations,

9    including explicitly the fact that Mr. Johnson did not gain

10   personally.

11          So, Mr. Johnson, if you rise, I will sentence you

12   at this time.

13          It is ordered that the defendant shall pay to the

14   United States a special assessment of $700, which is due

15   immediately.

16          It is ordered that the defendant shall pay

17   restitution in the amount of $2,515,560 pursuant to 18 USC

18   Section 3663A, paid in proportion to the victims' losses.

19          The amount of restitution ordered shall be paid as

20   follows:  Victim, Household Finance Services -- and I will

21   calculate this in the J&C, but it will be paid in the

22   proportion of their actual loss of $6,666,667 divided by

23   $9,333,334 times the amount of restitution ordered.  Regions

24   Bank also a victim, it's actual loss is $1,666,667.  Again,

25   the amount of restitution ordered here will be proportional.

1   Lloyds of London actual loss, $1 million.  This loss will

2   also be proportioned as well.

3          A partial payment of $100,000 shall be paid

4   immediately.  The balance shall be due during the period of

5   imprisonment, at the rate of not less than $25 per quarter,

6   and pursuant to the Bureau of Prisons' Inmate Financial

7   Responsibility Program.  If any amount of the restitution

8   remains unpaid after release from custody, monthly payments

9   of at least $500 shall be made during the period of

10  supervised release.  These payments shall begin 30 days

11  after the commencement of supervision.

12         Nominal restitution payments are ordered as the

13  Court finds that the defendant's economic circumstances do

14  not allow for either immediate or future payment of the full

15  amount ordered.  If the defendant makes a partial payment,

16  each payee shall receive approximately a proportional

17  payment unless another priority order or percentage payment

18  is specified in this judgment.

19         The defendant shall be held jointly and severally

20  liable with co-participate Kenneth Ketner for the amount of

21  restitution ordered in this judgment.

22         Pursuant to 18 USC Section 3612(f)(3)(A), interest

23  on the restitution ordered is waived because the defendant

24  does not have the ability to pay interest.  Payments may be

25  subject to penalties for default and delinquency pursuant to

 1 | 18 USC Section 3612(g).  The defendant shall comply with
 2 | General Order No. 01-05.
 3 | All fines are waived as it is found that the
 4 | defendant does not have the ability to pay a fine in
 5 | addition to restitution.
 6 | Pursuant to the Sentencing Reform Act of 1984, it
 7 | is the judgment of the Court that the defendant, Allen
 8 | Edward Johnson, is hereby committed on Counts 2 through 7
 9 | and Count 15 of the 18-count Indictment to the custody of
10 | the Bureau of Prisons for a term of 12 months and one day.
11 | This term consists of 12 months and one day on each of
12 | Counts 2 through 7 and Count 15 of the Indictment to be
13 | served concurrently.
14 | Upon release from imprisonment, the defendant
15 | shall be placed on supervised release for a term of three
16 | years.  This term consists of three years on each of Counts
17 | 2 through 7 and Count 15, all such terms to run concurrently
18 | under the following terms and conditions:
19 | 1.  The defendant shall comply with the rules and
20 | regulations of the U.S. Probation Office and General Order
21 | 318;
22 | 2.  During the period of community supervision,
23 | the defendant shall pay the special assessment and
24 | restitution in accordance with this judgment's orders
25 | pertaining to such payment;

1              3.   The defendant shall not engage as a whole or

2     partial owner, employee or otherwise, in any business

3     involving loan programs or investment programs without the

4     express approval of the probation officer prior to

5     engagement in such employment.  Further, the defendant shall

6     provide the probation officer with access to any and all

7     business records, client lists, and other records pertaining

8     to the operation of any business owned, in whole or in part,

9     by the defendant as directed by the probation officer;

10              4.   The defendant shall cooperate in the

11     collection of a DNA sample from the defendant; and

12              5.   As directed by the probation officer, the

13     defendant shall apply monies received from income tax

14     refunds, lottery winnings, inheritance, judgments, and any

15     anticipated or unexpected financial gains to the outstanding

16     Court-ordered financial obligation.

17              The drug testing condition mandated by statute is

18     suspended based on the Court's determination that the

19     defendant poses a low risk of future substance abuse.

20              Does the Government have any objection to

21     self-surrender?

22              MR. STOLPER:  No, Your Honor.

23              Could I have one minute with Mr. Riddet?

24              THE COURT:  Sure.

25              *(Counsel conferring)*

1        MR. STOLPER:  Your Honor, the Government has no

2   objection to self-surrender and makes the necessary

3   stipulations for it.  The Government would request that the

4   defendant be housed separately from Mr. Ketner, and if the

5   notation could be made in the J&C, that would be helpful.

6        THE COURT:  What is the reason for that?

7        MR. STOLPER:  Your Honor, Mr. Johnson is a

8   cooperator with respect to Mr. Ketner.  It's the

9   Government's position it's appropriate to keep them

10   separated while they're in custody.

11        THE COURT:  Do you know where Mr. Ketner is?

12        MR. STOLPER:  I believe that he is at Taft, Your

13   Honor, but I'm not certain.

14        MR. RIDDET:  I think that's where he is.

15        THE COURT:  Do you have any objection to that?

16        THE DEFENDANT:  Well, I want to be as close as

17   possible without being in the same place as Ketner.

18        THE COURT:  Well, I'll recommend that he not be

19   housed in the same facility as Kenneth Ketner and also

20   recommend that the Bureau of Prisons designate him to a

21   Southern California facility.  It all depends on

22   availability.

23        MR. STOLPER:  We will work with the BOP, Your

24   Honor, and Mr. Riddet to make sure that the Court's

25   recommendations are followed.

1          THE COURT:  Based on the Government's

2     representation, I find by clear and convincing evidence that

3     the defendant is not a flight risk or a danger to the

4     community.

5          What about a date for surrender?

6          MR. RIDDET:  I think it's taking six or seven

7     weeks to designate.  I'm just not sure.  By the way, we

8     would also ask that Your Honor put in the J&C a

9     recommendation that he be housed at a federal prison camp.

10    That's normally where he would go with a sentence like this.

11         THE COURT:  I will make the recommendation.  Let's

12    make sure there is enough time.  I will direct that Mr.

13    Johnson surrender to the facility designated no later than

14    August 15, 2008, at noon.  If no facility is designated, you

15    are to surrender on that date on/or before noon to the

16    United States Marshal on the second floor of this building.

17    Upon surrender, the bond will be exonerated.

18         MR. STOLPER:  At this point, Your Honor, the

19    Government would move to dismiss the remaining counts in the

20    Indictment.

21         THE COURT:  All remaining counts in the Indictment

22    as to Mr. Johnson will be dismissed.

23         Anything further?

24         MR. STOLPER:  No, Your Honor.

25         MR. RIDDET:  Thank you, Your Honor.

1          THE COURT:  Okay, thank you.

2              *(Thereupon, the proceeding was concluded.)*

3                          -oOo-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. COURT REPORTER

1

2

3

4

5                            CERTIFICATE

6

7          I hereby certify that pursuant to Section 753,

8    Title 28, United States Code, the foregoing is a true and

9    correct transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States.

13

14   Date:  July 15, 2008

15

16

17                         Sharon A. Seffens      7/15/08
                         _____
18                       SHARON A. SEFFENS, U.S. COURT REPORTER

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. COURT REPORTER